UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JEFF MITCHELL,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )        CIVIL NO.  3:08cv120
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security   )
                                  )
        Defendant.                )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social Security Act.  42 U.S.C. §416(I); 42 U.S.C. §423; 42 U.S.C. §§ 1382, 1382c(a)(3).  Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security
      Act through December 31, 2008.

2.    The claimant has engaged in substantial gainful activity since June 14,
      2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*.,
      416.920(b) and 416.971 *et seq*.).

3.    The claimant has severe impairments (20 CFR 404.1520(c) and
      416.920(c)).

4.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals one of the listed impairments in 20 CFR
      Part 404. Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
      404.1526, 416.925 and 416.926).

5.    The claimant's allegations that he was not able to work at any job between June
      2002 and August 2005 are not reliable.

6.    After careful consideration of the entire record, it is determined that the claimant
      has the functional capacity to perform a restricted range of light work.

7.    The claimant is unable to perform any past relevant work (20CFR 404.1565 and
      416.965).

8.    The claimant was born on September 15, 1963 and was 38 years old, which is
      defined as a younger individual age 18-49, on the alleged disability onset date (20
      CFR 404.1563 and 416.963).

9.    The claimant has at least a high school education and is able to communicate in
      English (20 CFR 404.1564 and 416.964).

10.   Transferability of job skills is not material to the determination of disability
      because using the Medical-Vocational Rules as a framework supports a finding
      that the claimant is "not disabled," whether or not the claimant has transferable
      job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.   Considering the claimant's age, education, work experience, and residual
      functional capacity, there are jobs that exist in significant numbers in the national
      economy that the claimant can perform (20 CFR 404.1560(c), 404.1566,
      416.960(c), and 416.966).

12.   The claimant has not been under a disability, as defined in the Social Security

Act, from June 14, 2002 through the date of this decision (20 CFR 404.1520(g)). (Tr. 16-25).

Based upon these findings, the ALJ determined that Mitchell was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Mitchell, proceeding pro se, filed his opening brief on October 1, 2008. On November 13, 2008, the defendant filed a memorandum in support of the Commissioner's decision, and on February 10, 2009, Mitchell filed his reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be affirmed.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

In February and April of 2004, Mr. Mitchell applied for Disability Insurance (DI) and

Supplemental Security Income (SSI) disability benefits alleging that he became unable to work on June 14, 2002, due to cervical radiculopathy and herniated discs. Mr. Mitchell's claims were denied administratively. He requested a hearing and Administrative Law Judge (ALJ) Bryan Bernstein conducted a hearing on August 24, 2006, during which Mr. Mitchell testified. Leonard Fisher, a vocational expert (VE), also testified. On October 29, 2007, the ALJ issued a decision denying Mr. Mitchell's disability claims. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Mr. Mitchell's request for review. Mr. Mitchell now seeks judicial review of defendant's denial of his disability claims.

Mr. Mitchell graduated from high school and worked as a shipper/receiver, painter, finisher and buffer (Tr. 68, 73). He stopped working in June 2002, when he was injured at work (Tr. 68). He returned to work in August 2005 (Tr. 127), and seeks DIB and SSI benefits only for the period from June 14, 2002 through August 2005.

On June 17, 2002, Mr. Mitchell woke up in the morning with neck pain (Tr. 133). He said that he felt fine when he went to bed the previous night and could not think of any trauma or stressful activity that could have caused his neck pain (Tr. 133). He went to the doctor, and an exam revealed a limited range of neck motion, but normal sensation and normal reflexes (Tr. 133). He went to the emergency room (ER) twice during the next week (Tr. 141-45). Exams revealed a limited range of neck motion, along with tenderness and muscle spasms in the neck and left trapezius muscle (Tr. 142, 144). Mr. Mitchell had normal sensation and strength in his upper extremities (Tr. 142, 144). Later that month, a magnetic resonance imaging (MRI) scan of the cervical spine revealed herniated discs at C5-6 and C6-7 with compression of the nerve root sleeve at C5-6 and flattening of the spinal cord at C6-7 (Tr. 140). He received an injection in the

neck from Dr. Eck and a trigger point injection from Dr. Glazier (Tr. 135, 182).

In July 2002, Dr. Glazier reported that the trigger point injection provided some relief, and he gave Mr. Mitchell epidural blocks and steroid injections (Tr. 156, 158, 182). Dr. Glazier also ordered an MRI of the left shoulder and prescribed physical therapy (Tr. 137, 159). The shoulder MRI revealed a "questionable" labral tear and tendinosis (Tr. 137). Mr. Mitchell attended five physical therapy sessions, consisting of traction, nerve glides and education, which resulted in an improved range of neck motion and decreased pain (Tr. 159-68). In the middle of the month, Mr. Mitchell saw Dr. Reecer for a consultative exam (Tr. 172-78). Mr. Mitchell told Dr. Reecer that he was injured at work when a saxophone that he was buffing was yanked away from him (Tr. 172). Mr. Mitchell stated that the traction helped, but he complained of neck pain, left arm pain, weakness and numbness, and left thumb numbness (Tr. 172). An exam revealed Mr. Mitchell had a limited range of neck motion, decreased sensation in the left arm and weak wrist extensor muscles (Tr. 173). However, he had normal ranges of motion in his elbows, wrists and hands, and a normal gait and station (Tr. 173). Dr. Reecer reviewed the cervical MRI results and opined that Mr. Mitchell would probably require surgery for his neck impairment (Tr. 173).

In August 2002, Dr. Glazier gave Mr. Mitchell another epidural block and steroid injection (Tr. 179-80). Dr. Glazier opined that Mr. Mitchell could perform sedentary work, but had a ten-pound lifting restriction and could not grip or lift with his left arm (Tr. 179-80, 299-300).

In September 2002, Dr. Glazier jotted a note on a prescription pad, stating that Mr. Mitchell had disabling pain in his neck and left arm and could not drive more than fifteen

minutes (Tr. 234, 246).

Mr. Mitchell saw Dr. Shugart, an orthopedic surgeon, in October, November and December 2002 (Tr. 188-203). In October 2002, an exam revealed neck and left shoulder pain, and numbness, reflex loss and weakness in the left arm (Tr. 204). Dr. Shugart recommended an electromyogram (EMG), imposed a ten-pound lifting restriction, and noted that Mr. Mitchell did not want to have surgery (Tr. 203-04). The EMG results were consistent with left C7 radiculopathy (Tr. 184-87). Dr. Shugart explained that he recommended surgery only at C5-6, and not C6-7, because Mr. Mitchell's problems stemmed from the C5-6 disc and his C6-7 disc was "asymptomatic" (Tr. 193). Dr. Shugart further explained that, as with any surgery, there was no guarantee that surgery would resolve all of his symptoms (Tr. 193). He stated that, without the surgery, Mr. Mitchell would have a 15% permanent whole body impairment (Tr. 200-01). Mr. Mitchell told Dr. Shugart that he did not trust him as a physician and was unsure whether he would have the surgery (Tr. 192). Mr. Mitchell explained that his family physician, Dr. Glazier, recommended that a neurosurgeon perform the surgery (Tr. 200). Dr. Shugart suggested that Mr. Mitchell obtain a written request from Dr. Glazier for a neurosurgeon, and stated that Mr. Mitchell could obtain a second opinion from a neurosurgeon at his own expense if he wished (Tr. 200-01). Dr. Shugart noted that Mr. Mitchell had "significant issues with regard to workmen's compensation" and that worker's compensation was "not responsible" for Mr. Mitchell's treatment (Tr. 200-01). In November 2002, Dr. Shugart opined that Mr. Mitchell could perform work with a sit/stand option that did not require him to lift, push or pull more than ten pounds, reach above shoulder level or work at unprotected heights (Tr. 194). In December 2002, Mr. Mitchell informed Dr. Shugart that he did not want to have surgery (Tr. 189, 211). Dr. Shugart

opined that Mr. Mitchell had reached maximum medical improvement, and he assigned Mr. Mitchell a permanent whole person impairment rating of 15% (Tr. 211).

On March 5, 2003, Mr. Mitchell saw Dr. Huler for a Worker's Compensation evaluation (Tr. 345). Dr. Huler noted that Mr. Mitchell was offered surgical treatment for his neck and left arm, but had not undergone such surgery (Tr. 345). An exam revealed painful neck motion, reflex loss in the left arm, and weak dorsiflexion in the left wrist (Tr. 345). Dr. Huler also reviewed the MRI results (Tr. 346). He opined that, absent additional treatment, Mr. Mitchell had reached maximum medical improvement (Tr. 346). He recommended cervical discectomy at C5-6 and C6-7 (Tr. 346).

In July 2003, Mr. Mitchell went to the ER three times in one week due to neck pain and narcotic withdrawal symptoms (Tr. 146-55). Exams revealed tenderness and a limited range of motion in the neck (Tr. 154). Although he complained of weakness and sensory loss in his left arm, exams revealed that Mr. Mitchell had "good" and "normal" strength" and "intact" neurosensory function, along with normal reflexes (Tr. 152, 154). He was given some Demerol and a Duragesic patch (Tr. 147-48, 152, 155).

On April 4, 2004, Dr. Glazier completed a food stamp application on Mr. Mitchell's behalf in which Dr. Glazier opined that Mr. Mitchell was "totally unable to work" (Tr. 303). Dr. Glazier explained that Mr. Mitchell could sit, stand, walk, push and pull, but could not lift more than fifteen pounds, hold objects with his right arm or bend his neck (Tr. 303). Dr. Glazier performed an exam that same day, which revealed decreased right arm grip strength (Tr. 331). The following month, Dr. Glazier again reported that Mr. Mitchell had decreased right arm grip strength (Tr. 331).

In August 2004, Mr. Mitchell saw Dr. Kodrick for a consultative exam (Tr. 258-60). Mr. Mitchell complained of neck pain that radiated into both arms, and said he had problems in both shoulders (Tr. 258). Mr. Mitchell told Dr. Kodrick that he had MRIs of the neck and left shoulder, but was unaware of the results (Tr. 258). An exam revealed a limited range of neck motion and a positive Spurling's sign on the right, but Mr. Mitchell had a full range of shoulder motion, normal grip strength, full hand dexterity, and could pick up a coin, button a button and open a door without difficulty (Tr. 259-60). He had normal straight leg raising and no difficulty with heel or toe walking, squatting or getting on or off the exam table (Tr. 259). His neurological status was intact, with normal sensation, reflexes and motor strength (Tr. 260).

On August 26, 2004, a state agency physician reviewed the record and opined that Mr. Mitchell could occasionally lift, push and pull twenty pounds, frequently lift, push and pull ten pounds, sit for six hours in an eight-hour workday and stand/walk for six hours in an eight-hour workday (Tr. 262). Mr. Mitchell could occasionally climb ladders, ropes and scaffolds, frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl (Tr. 263). He had no other limitations (Tr. 264-65).

The following month, Dr. Glazier completed a food stamp application on Mr. Mitchell's behalf, stating that Mr. Mitchell was totally unable to work (Tr. 302).

On October 28, 2004, Mr. Mitchell saw Anne Kantor, M.A., for a psychological evaluation (Tr. 269-75). Mr. Mitchell told Ms. Kantor that he had been intermittently depressed for ten years, and continuously depressed for the past three years (Tr. 269). He said he had not received any mental health treatment since he stopped working in June 2002 (Tr. 269-70). Mr. Mitchell also stated that he had anxiety, but believed that his anxiety was justifiable (Tr. 270).

He stated that no one understood what he had gone through with his injury (Tr. 270). Mr. Mitchell explained that his doctor told him to have the neck surgery performed at two disc levels by a neurosurgeon, but worker's compensation would only authorize surgery at one disc level by an orthopedic surgeon (Tr. 269). He said the worker's compensation orthopedists were "quacks" and "paid whores" (Tr. 269-70). He settled with worker's compensation more than a year ago, but did not undergo surgery because he did not have insurance coverage (Tr. 269). He said steroid injections were "moderately helpful" (Tr. 269).

Mr. Mitchell stated that he got along well with neighbors, had a couple of friends and had no problems getting along with bosses and co-workers, but had an antagonistic relationship with his alcoholic brother (Tr. 271). He enjoyed playing piano, went shopping, did laundry, and fixed simple meals (Tr. 271). On examination, Mr. Mitchell appeared tense, irritable and "very focused on himself and his symptoms," but did not display any evidence of psychomotor agitation or retardation (Tr. 272). He said he was irritable and depressed, was in a bad mood most of the time, and had been "jerked around" (Tr. 273). He complained that he applied for disability "in April, and it's still dragging on [in October]" (Tr. 273). However, he had adequately organized thoughts and no hallucinations (Tr. 272). He said he had some suicidal thoughts in the past, but did not have any current ideation (Tr. 273). He repeated seven numbers forward and four numbers backward, recalled three out of three objects after a three-minute delay, identified the past four presidents, five large cities, four famous people and current events (Tr. 273-74). He subtracted sevens serially from one hundred, and performed simple mathematical calculations without error (Tr. 274). He had adequate abstract thinking and some judgment (Tr. 274). Ms. Kantor diagnosed major depressive disorder and anxiety disorder, and

assigned Mr. Mitchell a score of 50 on the Global Assessment of Functioning (GAF) scale (Tr. 275).

On November 19, 2004, Dr. Khan reviewed the record and opined that Mr. Mitchell had "moderately" limited abilities to carry out detailed instructions, interact appropriately with the general public and set realistic goals (Tr. 280-81). Dr. Khan opined that Mr. Mitchell could perform simple tasks on a sustained basis (Tr. 282).

In December 2004, Mr. Mitchell saw Dr. Glazier due to neck pain (Tr. 330). An exam revealed mild to moderate neck and back tenderness, but Mr. Mitchell's grip strength was "OK" (Tr. 330). In January 2005, Dr. Glazier similarly reported that Mr. Mitchell had mild to moderate neck and upper and lower back tenderness, but Mr. Mitchell's grip strength was "OK" (Tr. 330).

On April 17, 2005, Dr. Glazier completed another food stamp application on Mr. Mitchell's behalf, and opined that Mr. Mitchell was totally unable to work (Tr. 304). Dr. Glazier explained that Mr. Mitchell could lift less than ten pounds, had a 30% decrease in his grip strength and could not perform "any job requiring upper body grip strength or skill" (Tr. 304, 306-07). Dr. Glazier stated that he did not recommend a "psychological/psychiatric mental status evaluation" (Tr. 306). On the last page of the food stamp form, Dr. Glazier stated that Mr. Mitchell had moderately limited abilities to care for his personal needs, and tolerate exposure to dust, fumes, gases, and changes in temperature and humidity (Tr. 308). He also had significantly limited abilities to sit, stand, walk, lift, grasp/manipulate, push/pull, bend, squat, crawl, climb, reach above shoulder level, work around machinery, perform normal housework and drive (Tr. 308). Dr. Glazier also performed a physical examination that day, which revealed neck and low back tenderness, but normal (negative) straight leg raising (Tr. 329). Dr. Glazier did not report

any grip strength loss or any other abnormal findings (Tr. 329).

Mr. Mitchell returned to work in August 2005 (Tr. 127, 375). In the middle of that month, lumbar x-rays revealed degenerative disc disease with vacuum disc phenomenon, spurring and facet arthrosis at L5-S1, and facet arthrosis at L4-5 (Tr. 312). A CT scan of the lumbar spine revealed mild disc bulging at L4-5 and L5-S1 (Tr. 309). The bulging caused some recess narrowing, but it was unclear whether there was any nerve root impingement, and a MRI was recommended (Tr. 309). Near the end of the month, an MRI of the lumbar spine revealed the disc bulging, facet arthrosis and recess narrowing, but there was "no definite nerve root impingement" (Tr. 310).

On December 13, 2005, Mr. Mitchell saw Dr. Cooke for a consultative exam (Tr. 320). Mr. Mitchell told Dr. Cooke that he had a history of neck pain, but noted that it was treated by Dr. Glazier and improved (Tr. 320). He said he previously took medication for his neck problem, but was "off this medicine" and that physical therapy and steroid injections helped his neck pain (Tr. 321). Mr. Mitchell also said he had a history of back pain that was treated in 1994, but his pain increased during the past year (Tr. 320). He said "recently, the majority of his symptoms have been in the low back region" (Tr. 320). He complained that he had some leg numbness and difficulty sitting and standing for prolonged periods (Tr. 320). Lastly, Mr. Mitchell noted that he had "a history of depression and anxiety in the past," but did not indicate that he had any current psychological problems (Tr. 321). An exam revealed a "good" range of neck motion with some decreased motion to the left (Tr. 322). He had a mildly antalgic gait, and painful lumbar motion and right straight leg raising, but normal sensation, normal reflexes, normal strength and good heel and toe walking (Tr. 321-22). Dr. Cooke recommended physical

therapy, lumbar epidural steroid injections, pain medication and weight loss (Tr. 322-23).

On December 22, 2005, Mr. Mitchell reported that his pain ranged from a level of one or two at its lowest to a level of nine or ten at its highest, and it was currently a level three (Tr. 316). He said level of zero or one would be an "acceptable pain level for [him]" (Tr. 316). He said his pain had a "mild" effect on his ability to do housework and his relationships with others, and a "moderate" effect on his mood and ability to sleep (Tr. 316).

On January 12, 2007, Dr, Glazier completed a form, stating that Mr. Mitchell was not capable of working (Tr. 342). He opined that Mr. Mitchell could walk for a total of one hour in an eight-hour day, sit for less than one hour total in an eight-hour day, and stand for less than one hour total in an eight-hour day (Tr. 342). However, he did not need to lie down because lying down increased his pain (Tr. 343). Dr. Glazier further opined that Mr. Mitchell could occasionally lift ten pounds, bend, squat, stoop, climb stairs, reach above shoulder level, kneel, crouch, reach, handle and finger (Tr. 343). He could never work at unprotected heights or around moving machinery (Tr. 343).

In an undated letter addressed to "Judge Steven Platt," the judge who handled Mr. Mitchell's child custody case, Dr. Glazier opined that Mr. Mitchell was "disabled and unable to work" (Tr. 301, 363-64). Dr. Glazier explained that Mr. Mitchell had problems with his grip strength and his pain was aggravated by lifting less than fifteen pounds (Tr. 301).

In May 2004, Mr. Mitchell reported that he fixed simple meals once or twice a day, did laundry, folded clothing, mowed the lawn, drove a car, went grocery shopping three or four times a week for an hour, and was able to pay bills, count change, handle a savings account and use a checkbook (Tr. 105-07). He enjoyed reading, and read every day (Tr. 107). He could walk ½

mile, follow written and oral instructions, and had no problem getting along with bosses, teachers, police, landlords or other people in authority (Tr. 109).

During the February 7, 2007 hearing, Mr. Mitchell testified that he returned to work in August 2005 (Tr. 375). When asked whether anything changed from a medical perspective at the time he went back to work, Mr. Mitchell responded that MRIs performed three or four months before he went back to work showed "slight" improvement, but Dr. Glazier maintained the same work restrictions (Tr. 377). Mr. Mitchell said the work restrictions were a 15-pound weight limit, and unspecified restrictions on pushing, pulling, and "some standing, walking" (Tr. 377). Mr. Mitchell stated that he exceeded these restrictions when he worked for Woodwind Brasswind and "did well until [his] daughter [be]came ill" (Tr. 377). He said he stopped working at Woodwind Brasswind so he could stay at home to take care of his daughter (Tr. 378).

Mr. Mitchell also testified that his neck "acted up" about six weeks before the hearing (Tr. 365). He said he did not have surgery because he "had no faith in the Worker's Comp system" (Tr. 374). He said his pain was usually a level four or five, but could go as high as a level eight, and that it had been at a level eight for the past six weeks (Tr. 380). He said that he worked when his pain was a level eight (Tr. 381). He stated that, in his post-injury work, he remained on his feet for the majority of the day and "got through it" (Tr. 397). He noted that, between June 2002 and August 2005, "all [he] did was sit around for a couple of years" (Tr. 384).

Leonard Fisher, the vocational expert, was asked to assume the existence of an individual who had the abilities and limitations ultimately identified in the ALJ's RFC finding (Tr. 387-89). Mr. Fisher testified that such an individual could perform light jobs work as an office helper,

parking lot attendant, cashier II, electronics worker and information clerk (Tr. 393). There were

2,375 such jobs in the local economy and 23,750 such jobs in the State of Indiana (Tr. 393-94).

The vocational expert testified that the individual could still perform such jobs if he could sit or

stand for only a half hour without changing positions (Tr. 396).

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The agency

has promulgated regulations that set forth a five-step sequential process for analyzing disability

claims. 20 C.F.R. §§ 404.1520, 416.920. A claimant has the joint burdens of production and

persuasion through at least step four, where the individual's residual functional capacity (RFC) is

determined. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); 20 C.F.R. §§ 404.1545, 416.945.

At step five the Commissioner bears the burden of proving that there are jobs in the national

economy that the Villano can perform. Herron v. Shalala, 19 F.3d 329, 333 n.18 (7th Cir. 1994).

In the present case, the ALJ found that Mr. Mitchell retained the ability to perform other work

within the national economy.

The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which

provides that the agency findings "as to any fact, if supported by substantial evidence, shall be

conclusive." "Substantial evidence is . . . such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).

Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a

claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or on the

[Commissioner's] designate, the ALJ)."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)(citations omitted).  This court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).

The ALJ found that Mr. Mitchell's impairments were severe but did not meet Listing 1.02 (AR. 17), and that "he does not have involvement of one major peripheral joint in each upper extremity resulting in incapability to perform fine and gross movements effectively as defined in 1.00B2c." (AR. 17).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The agency has promulgated regulations that set forth a five-step sequential process for analyzing disability claims.  20 C.F.R. §§ 404.1520, 416.920.  A claimant has the joint burdens of production and persuasion through at least step four, where the individual's residual functional capacity (RFC) is determined.  Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); 20 C.F.R. §§ 404.1545, 416.945.  At step five the Commissioner bears the burden of proving that there are jobs in the national economy that the Villano can perform.  Herron v. Shalala, 19 F.3d 329, 333 n.18 (7th Cir. 1994).  In the present case, the ALJ found that Mr. Mitchell retained the ability to perform other work within the national economy.

The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that the agency findings "as to any fact, if supported by substantial evidence, shall be

conclusive." "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or on the [Commissioner's] designate, the ALJ)." <u>Walker v. Bowen</u>, 834 F.2d 635, 640 (7th Cir. 1987)(citations omitted). This court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).

In support of reversal, Mr. Mitchell claims that the Commissioner has admitted that he was discriminated against. Mr. Mitchell also argues that the ALJ failed to understand that the remarks made on his food stamp application "were only used to keep me from having to participate in the D.O.F.C's work program, and they were filled out hastily". Mr. Mitchell also believes that the ALJ did not understand that he was seeking a closed period of benefits, not ongoing disability payments. Mr. Mitchell acknowledges that he went back to work after the onset of his medical problems, but states that he only did so to obtain custody of his daughter. Mr. Mitchell states that going back to work was against the recommendation of his doctor, and that the records of Dr. Glazier support his claim that he was unable to work and that to do so would lead to more health risks.

The Commissioner asserts, however, that the ALJ's decision is supported by substantial evidence. The ALJ found that Mr. Mitchell had the residual functional capacity (RFC) to perform a limited range of light work that did not require him to lift more than fifteen pounds occasionally

or more than five pounds frequently; more than occasionally stoop, kneel or bend; or constantly use his hands or fingers for fine work, gripping, grasping, twisting, turning, picking, pushing or pulling; or involve closely regimented pace of production or close and critical supervision (Tr. 18-19). Mr. Mitchell does not contest the Commissioner's assertion that this RFC finding accommodated Mr. Mitchell's impairments.

Mr. Mitchell complained of neck pain that radiated down his left arm and caused pain, weakness and numbness into his left hand and thumb. Physical examinations showed Mr. Mitchell had a limited range of neck motion and, on some occasions, a weak grip, and/or upper extremity sensory loss or reflex loss (Tr. 133, 142, 144, 173, 204, 259, 345). However, other exams revealed normal grip strength, normal sensation and normal reflexes (Tr. 133, 142, 144, 152, 154, 259-60, 330). Moreover, Mr. Mitchell was able to pick up a coin, button a button and open a door without difficulty (Tr. 259-60). The ALJ's finding that Mr. Mitchell was unable to constantly use his hands or fingers for fine work, gripping, grasping, twisting, turning, picking, pushing or pulling accommodated Mr. Mitchell's neck/hand impairment.

The evidence also contained several opinions regarding Mr. Mitchell's ability to lift. The state agency physician opined that Mr. Mitchell could occasionally lift twenty pounds and frequently lift ten pounds (Tr. 262). Dr. Shugart opined that Mr. Mitchell could lift ten pounds (Tr. 194). Dr. Glazier twice opined that Mr. Mitchell could lift fifteen pounds (Tr. 301, 303), twice opined that Mr. Mitchell could lift ten pounds (Tr. 299, 343) and, on one occasion, opined that Mr. Mitchell could lift less than ten pounds (Tr. 304). The evidence also showed that, after he returned to work in August 2005, Mr. Mitchell performed exertionally light and medium jobs (Tr. 390-92). The ALJ's finding that Mr. Mitchell could occasionally lift fifteen pounds and

frequently lift only ten pounds rationally resolved the conflicting physician opinions and reasonably accommodated Mr. Mitchell's lifting limitations, especially in light of his recent work experience.

To the extent that Mr. Mitchell had any limitations on his abilities to sit, stand and walk, these were also accommodated by the ALJ's RFC finding. The ALJ found that Mr. Mitchell could not stand and walk more than 75% of a workday (i.e., not more than six hours in an eight hour day), but did not limit Mr. Mitchell's ability to sit (Tr. 18). This was supported by the objective clinical findings, the state agency physician's opinion and the opinion of Dr. Glazier, and Mr. Mitchell's testimony. The physical examinations prior to August 2005, when Mr. Mitchell returned to work, did not reveal significant problems with Mr. Mitchell's back or lower extremities that would have prevented him from sitting, standing or walking. In fact, except for three instances of "lumbar tenderness" (Tr. 329-30), no physician reported any abnormal lumbar or lower extremity findings prior to August 2005 (Tr. 133, 142, 144, 152, 154, 169, 173, 184, 200, 204, 224, 226-32, 259, 298-300, 304-07). Mr. Mitchell had normal straight leg raising, a normal gait, full ranges of leg motion, and no lumbar muscle spasms, or difficulty with heel or toe walking, squatting or getting on or off the exam table (Tr. 152, 154, 173, 259, 329).

Moreover, the state agency physician opined that Mr. Mitchell could sit for six hours in an eight hour day and stand/walk for six hours in an eight-hour day, and Dr. Glazier opined that Mr.

Mitchell could sit, stand and walk (Tr. 262, 303). Lastly, Mr. Mitchell also testified that, after he returned to work, at least one of his jobs required that he remain on his feet for the majority of the day and that he "got through it" (Tr. 397). He also testified that, between June 2002 and

August 2005, "all [he] did was sit around" (Tr. 384). Given the lack of abnormal lumbar findings, the opinions of the state agency physician, the lack of change in Mr. Mitchell's condition, and his established ability to sit and stand for prolonged periods, the ALJ reasonably found that Mr. Mitchell could perform the sitting, standing and walking required by light work (Tr. 18).

There was very little evidence concerning Mr. Mitchell's mental condition but, to the extent Mr. Mitchell had a mental impairment and resulting limitations, they were accommodated in the ALJ's RFC finding. Mr. Mitchell underwent a consultative psychological evaluation, during which he appeared tense, irritable and "very focused on himself and his symptoms," but he did not display any evidence of psychomotor agitation or retardation (Tr. 272). He stated that he got along well with neighbors, had a couple of friends and had no problems getting along with bosses and co-workers (Tr. 271). He enjoyed playing piano, went shopping, did laundry, and fixed simple meals (Tr. 271). He had adequately organized thoughts and no hallucinations (Tr. 272). He said he had some suicidal thoughts in the past, but no current ideation (Tr. 273). He repeated seven numbers forward and four numbers backward, recalled three out of three objects after a three-minute delay, identified the past four presidents, five large cities, four famous people and current events (Tr. 273-74). He subtracted sevens serially from one hundred, and performed simple mathematical calculations without error (Tr. 274). He had adequate abstract thinking and some judgment (Tr. 274). The diagnosis was major depressive disorder and anxiety disorder (Tr. 275). Subsequently, Dr. Khan reviewed the record and opined that Mr. Mitchell had "moderately" limited abilities to carry out detailed instructions, interact appropriately with the general public and set realistic goals (Tr. 280-81). Dr. Khan opined that, despite these

moderately limited abilities, Mr. Mitchell could perform simple tasks on a sustained basis (Tr. 282). Based on all of this evidence, the ALJ reasonably found that Mr. Mitchell could perform jobs that did not involve closely regimented pace of production or close and critical supervision (Tr. 19). Mr. Mitchell does not suggest that the ALJ erred in evaluating his mental abilities and limitations.

Leonard Fisher, the vocational expert, was asked to assume the existence of an individual who had the abilities and limitations ultimately identified in the ALJ's RFC finding (Tr. 387-89). Mr. Fisher testified that such an individual could perform light jobs work as an office helper, parking lot attendant, cashier II, electronics worker and information clerk (Tr. 393). There were 2,375 such jobs in the local economy and 23,750 such jobs in the State of Indiana (Tr. 393-94). The vocational expert also testified that the individual could perform such jobs if he could sit or stand for a half hour before changing positions (Tr. 396).

The vocational expert identified a significant number of jobs that Mr. Mitchell could perform. *See Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1,400 jobs is a significant number). An ALJ may rely on vocational testimony given in response to a hypothetical question that accurately portrays the claimant's impairments and limitations to the extent that they are supported by the evidence of record. *See Ehrhart*, 969 F.2d at 540. In the present case, the hypothetical question contained the limitations that were supported by the record.

Mr. Mitchell does not challenge the ALJ's finding regarding his mental abilities. Nor does Mr. Mitchell challenge the ALJ's finding concerning any particular physical ability. As noted, Mr. Mitchell argues that the Commissioner admitted that he "was discriminated against." In his answer, however, the Commissioner "admitted" paragraph 1, which included Mr.

Mitchell's social security number, county and state of residence, and the date and administrative level of the most recent Agency action on Mr. Mitchell's benefit applications. The Commissioner did not "admit" paragraph 2 of Plaintiff's complaint, in which Mr. Mitchell alleged that he had been subject to discrimination.

Mr. Mitchell also argues that the ALJ should not have rejected Dr. Glazier's inconsistent opinions, which he rendered on food stamp applications. In support of his argument, Mr. Mitchell states that the food stamp applications "were only used to keep me from having to participate in the D.O.F.C.'s work program." *Id.* However, it did not matter whether the information supplied by Dr. Glazier was going to be used to a work program or some other program. What mattered was that Dr. Glazier rendered contradictory opinions without supporting medical data. As previously noted, where a physician changes his opinion for the worse, and the medical evidence does not reflect a corresponding deterioration in the claimant's condition, the ALJ may reasonably reject the changed opinion. *See Books*, 91 F.3d at 979. Moreover, to the extent that Dr. Glazier or Mr. Mitchell might have attempted to manipulate the work program, this undermines the reliability of Dr. Glazier's opinions and the credibility of Mr. Mitchell's allegations.

Mr. Mitchell also argues that he was seeking only a closed period of disability, rather than ongoing benefits, because he returned to work. However, the ALJ clearly acknowledged that Mr. Mitchell returned to work and began to engage in substantial gainful activity in August 2005 (Tr. 16-17). Mr. Mitchell also appears to suggest that the ALJ should not have considered Mr. Mitchell's return to work. *Id.* However, it is the ALJ's duty to evaluate all of the evidence of record, including Mr. Mitchell's work history and any return to work. *See* 20 C.F.R. §§

404.1520a(4)(I), 4041529(c)(3); 416.920a(4)(I), 416.929(c)(3). The medical evidence showed that Mr. Mitchell reached maximum medical improvement by December 2002 (Tr. 211, 346). There was no evidence that Mr. Mitchell's condition significantly improved at any time near August 2005 and suddenly allowed him to return to work at that time. Indeed, if anything, Mr. Mitchell's condition deteriorated in 2005 (Tr. 309-10, 312, 329-30). Yet, Mr. Mitchell was clearly able to perform substantial gainful activity in August 2005 and thereafter. Given the evidence, the ALJ reasonably inferred that Mr. Mitchell had the ability to perform at least some limited work-related tasks prior to his actual return to work in August 2005.

Accordingly, as the ALJ's decision is sufficiently supported by the record, the decision to deny benefits will be affirmed.

Conclusion

Based on the foregoing, the decision of the ALJ is hereby AFFIRMED.


Entered: March 16, 2009.


s/ William C.  Lee
William C. Lee, Judge
United States District Court